**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

| | |
|---|---|
| **TY ORR OWENS** | ) |
| 43335 Earls Court | ) |
| Ashburn, VA  20147 | ) |
| | ) |
| Plaintiff, | ) |
| | ) Civil Action No. |
| v. | ) JURY TRIAL DEMANDED |
| | ) |
| **SYLVIA MATHEWS BURWELL,** | ) |
| **SECRETARY** | ) |
| **U.S. DEPARTMENT OF** | ) |
| **HEALTH & HUMAN SERVICES** | ) |
| 200 Independence Avenue, SW | ) |
| Washington, DC 20201 | ) |
| | ) |
| Defendant. | ) |

_____)

## COMPLAINT

1.     Ty Orr Owens brings this action for damages based on the denial of his rights under

Title VII of the Civil Rights Act, 42 U.S.C. § 2000e _et seq._ (hereafter "Title VII").  Specifically,

the United States Department of Health & Human Services, (hereinafter "HHS," the Agency or

"Defendant") subjected Plaintiff Owens to harassment and a hostile work environment because of

his race (African-American), sex (male) and in reprisal, as well as discriminated against him

because of his race by failing to compensate him for performing higher graded duties; not selecting

him for two (2) positions he was highly qualified for; and failing to give him an incentive

award/bonus.

## JURISDICTION AND VENUE

2.     The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331;

1343(a)(4); and 42 U.S.C. § 2000e-5.

3.      Pursuant to 28 U.S.C. § 1391(e), venue is proper in the District of Columbia which is the location of the Agency's principal office, where Plaintiff worked while employed at the Agency and where, upon information and belief, the employment records relevant to the Complaint are located.

## THE PARTIES

4.      Plaintiff Ty Orr Owens is currently employed with HHS as an IT Specialist, GS-2210-14, serving as a Program Manager and a Contracting Officer's Technical Representative (COTR) in the Office of the Secretary, Office of the Assistant Secretary for Administration, Office of the Chief Information Officer/Information Technology, Infrastructure and Operations.   Mr. Owens is an African-American male and he has engaged in protected activities against the Agency.

5.      Defendant Sylvia Mathews Burwell is the Secretary of the United States Department of Health & Human Services.  Mr. Owens brings suit against Secretary Burwell in her official capacity as provided by law based on her executive responsibility for administering the personnel policies of HHS and her responsibility to enforce and promote equal employment opportunity throughout HHS.   During the relevant time period, HHS employed over 500 employees.

6.      Ronald Thompson, Director of Information Technology Infrastructure and Operations ("ITIO"), is not a named defendant in this lawsuit, but is one of the management officials responsible for the discriminatory acts and harassment against Mr. Owens as set forth in this Complaint.

7.      Jon Mitchiner, Telecommunications Branch Chief, is not a named defendant in this lawsuit, but is one of the management officials responsible for the discriminatory acts and harassment against Mr. Owens as set forth in this Complaint.

## FACTS

8.      Plaintiff Owens adopts and incorporates by reference all averments in the foregoing paragraphs.

9.      In October 2013, Mr. Owens's immediate supervisor, Gary Wall, Telecommunications Branch Chief, went on a detail to the General Services Administration (GSA), leaving his position vacant.  Prior to leaving for the detail, Mr. Wall appointed Mr. Owens, a GS-14 employee, to take over the job duties and responsibilities of two GS-15 positions, namely Acting Network Program Manager, GS-15, from October 17, 2013 until May 5, 2014, as well as Acting Telecommunications Branch Chief from December 2, 2013 until May 5, 2014.  Mr. Owens also served as the primary Network Contracting Officer Representative ("COR"), a position Mr. Owens still holds because neither of the successive Branch Chief or the ITIO Director are COR certified.

10.     Although Mr. Owens' supervisory authority was limited, he nonetheless performed all of the essential functions and duties of the Branch Chief position from his appointment on December 2, 2013, until May 5, 2014, when a new Branch Chief was selected.  Similarly, Mr. Owens also carried out all of the job duties of the Acting Network Program Manager and COR. Concurrent with these higher level duties, Mr. Owens was still responsible for his job functions as an IT Specialist, GS-14 because ITIO was under staffed.  Yet, despite performing the duties of three (3) separate positions, two of which were higher graded, Mr. Owens was not compensated for the higher level duties or additional workload.

11.     In November 2013, Ronald Thompson, a Caucasian, became Director of ITIO. Immediately upon his appointment, Mr. Thompson began to berate, belittle and treat Mr. Owens

differently and less favorably than other white and female peers and co-workers.  The harassment made Mr. Owens's work environment intolerable and hostile.

12.     After Mr. Thompson became Director, Mr. Owens made repeated requests, via Mr. Thompson's administrative assistant, Jacqueline Harris, to be compensated for the higher level work and additional duties he performed while in an Acting capacity.  Mr. Thompson failed to respond, ignored Mr. Owens' concerns and eventually denied Mr. Owens the additional compensation he had earned.

13.     In mid-December 2013, Mr. Thompson engaged Atacan Donmez, from eGlobal, to work in ITIO.  Mr. Thompson had worked with Mr. Donmez at the IRS and the two had a personal relationship.  Mr. Thompson and Mr. Donmez held meetings in regards to Video Teleconferencing ("VTC") and Unified Communications ("UC") on a regular basis without any input from Mr. Owens in his role as the COR.  Concerned that he was being excluded, Mr. Owens approached Mr. Thompson and advised him that Mr. Donmez was not on the contract and that, as the COR, he needed to be included in any discussions involving the Network support contract.  The next day, Mr. Thompson threatened Mr. Owens by telling him a "story" about a similar situation involving a COR not wanting management to have direct contact with the contractors.  Mr. Thompson said "to make a long story short the COR was terminated."  Taken aback by his threat, Mr. Owens advised Mr. Thompson that his intentions were to make sure that ITIO adhered to federal regulations when dealing with contractors and to avoid any appearance of impropriety. After advising Mr. Thompson of his role as the COR, Mr. Thompson continued to routinely met and tasked eGlobal contractors without Mr. Owens' approval or even the courtesy of providing him with notice.

14.     In December 2013 or January 2014, Mr. Owens presented Mr. Thompson with a detailed communications plan.  The plan was necessary because ITIO customers were repeatedly asking about the Network program and ITIO needed to communicate the impact of the telecommunications program reorganization.  Mr. Owens also asked Mr. Thompson about his vision for ITIO because Mr. Owens wanted to ensure that his actions were in-line with Mr. Thompson's goals and objectives.  Mr. Thompson either refused or was unable to articulate his goals to Mr. Owens.  Further, Mr. Thompson dismissed Mr. Owens' communication plan as a waste of time.  Mr. Owens disagreed and explained that the time he spent on creating the communications plan document was justified because customers had concerns that needed to be addressed.

15.     In approximately January 2014, during a management meeting, Mr. Owens informed Mr. Thompson that ITIO should consider changing the billing structure.  Mr. Owens expressed his concern that, if ITIO continued to bill under the current structure, ITIO would not be able to meet budget in FY2015. Mr. Thompson responded that it was not a big problem and that ITIO could cut vacancies. Mr. Owens explained that a better solution was to change the billing structure for customers and that ITIO could both save money and ensure against the volatility of the telecommunication programs. Mr. Thompson simply dismissed Mr. Owens without providing a business justification for his conclusion.  Based upon subsequent exchanges and observations, Mr. Owens believes that Mr. Thompson rejected the advice because Mr. Thompson does not respect or value the professional opinions of African-American males.

16.     In approximately January or February 2014, Mr. Thompson advised Mr. Owens that he was making Mr. Donmez available to assist on the VTC and UC federal projects.  However, Mr. Donmez was not under contract for the VTC and UC projects.  Accordingly, Mr. Owens

expressed his reluctance to seek assistance from Mr. Donmez, the person Mr. Thompson worked with previously at the IRS, and declined the invitation to include Mr. Donmez on the project.  Mr. Thompson chastised Mr. Owens for not utilizing Mr. Donmez as a resource.  Mr. Thompson then had Mr. Donmez write a business case for converting the UC project and gave the business to Mr. Donmez without competition.

17.     Mr. Thompson continued to work with Mr. Donmez and treated him like any other government employee, which was impacting the performance and morale of the Telecomm Group. Mr. Thompson gave Mr. Donmez access to information and allowed him to attend meetings which made him more knowledgeable than the federal staff.  As a result, the federal staff felt alienated because they were treated as though they were working for the contractor.  Mr. Donmez basically took over the lead for the VTC and UC federal projects.  Mr. Thompson also instructed Mr. Owens to directly share vendor propriety cost and technical proposal information with Mr. Donmez who was not on any ITIO contracts or a party to the Network Non-Disclosure or Conflict of Interest agreements.  Concerned about this practice, Mr. Owens told Mr. Thompson that his utilization of Mr. Donmez could be viewed as a personal services contract and was potentially in violation of Federal Acquisition regulations.

18.     From February 2014 to March 2014, Mr. Thompson required Mr. Owens to meet unrealistic and moving deadlines on the UC project.  And, when Mr. Owens took the actions Mr. Thompson directed, such as scheduling meetings with the CIO to gain knowledge of his UC project requirements, Mr. Thompson would later reprimand Mr. Owens for scheduling the meeting without his knowledge.  Additionally, Mr. Thompson would also unfairly and repeatedly chastise Mr. Owens for not "making progress" on the UC project.  But when Mr. Owens delivered key project deliverables (i.e. project charter, scope), Mr. Thompson was either non-responsive or failed

to provide the necessary feedback and clarification, which ultimately delayed progress on the project.

19.     In February 2014, Mr. Thompson began to unfairly scrutinize Mr. Owens' work, nick-picking the tiniest error or mistake in an attempt to find fault and to criticize Mr. Owens without justification.  For example, on February 7, 2014, Mr. Thompson sent an email which inappropriately berated and chastised Mr. Owens' work on the Network Program contract.  Mr. Thompson also copied Mr. Donmez on the communication.  Mr. Thompson also claimed in a separate incident that there were six (6) instances when Mr. Owens had failed to call him back after work hours or to follow-up with him on small action items.  At the time, Mr. Owens had responsibility for three distinct job functions and had to prioritize his time carefully.  Yet, Mr. Thompson never commented on the things that Mr. Owens accomplished and only elaborated on the small things that did not get completed. At this point, Mr. Owens concluded that Mr. Thompson was targeting him to replace him with someone else.

20.     In January 2014, Mr. William "Bill" Polk, the VTC Subject Matter Expert ("SME"), who is a Black male, recommended a VTC solution which the customer (Facilities Group) had approved and accepted.  Mr. Owens also supported the recommendation.  However, Mr. Thompson rejected Mr. Polk's suggestion on the grounds that it did not include Cisco equipment.  Specifically, upon being briefed by Mr. Polk on what the intent was for installing VTC into the identified conference rooms, Mr. Thompson stopped the presentation and demanded that Mr. Polk and Mr. Owens use a Cisco solution.  Mr. Polk, the SME responsible for overseeing the technical aspects of the project, advised Mr. Thompson that the Cisco equipment had a tendency to overheat and that it was more expensive.  The solution recommended by Mr. Polk and Mr. Owens addressed the overheating issues and was less expensive than the Cisco equipment.

Because Mr. Thompson did not understand the issues involving the VTC project, he elected to use the more expensive Cisco equipment without conducting a technical and fair competition evaluation.

21.     And, later in March 2014, Mr. Thompson had Mr. Donmez conduct a business case to justify why Cisco was the best solution and then awarded eGlobal the work.  As a result, instead of being able to outfit nine (9) conference rooms, which was in the plan Mr. Polk and Mr. Owens advocated, only three (3) could be completed.   The customer expressed dissatisfaction and demanded that nine (9) conference rooms be completed instead of the three (3) recommended in Mr. Thompson's solution.  Had Mr. Thompson allowed Mr. Polk and Mr. Owens to move forward with the original plan, all nine (9) conference rooms would have been completed by June 2014. However, there was substantially less progress made on the VTC project because of Mr. Thompson's interference.  Mr. Owens concluded that the real issue was not differing opinions on how to complete the VTC project, but the fact that Mr. Thompson refused to accept the fact that two black men advised him on the best solution.  Despite the clear business justification presented by Mr. Polk and Mr. Owens, Mr. Thompson wrongly allowed his racial prejudice to cloud his decision and rejected the proposal of Mr. Polk and Mr. Owens without articulating any support for his alternative solution.

22.     Mr. Owens' perception of racial motivation by Mr. Thompson was reinforced during a meeting in February 2014.  Mr. Owens and Mr. Polk were in attendance when abruptly, without any context or prompting, Mr. Thompson stated that he liked Samuel Jackson.  Mr. Polk and Mr. Owens were confused by this statement when Mr. Thompson continued by displaying a sign with Samuel Jackson's picture on it and a caption that read, "Do you think I'm joking."  Mr. Thompson told Mr. Owens and Mr. Polk that, "When you see me hold this up (referring to Samuel

Jackson's picture), it means that I am pissed."  Mr. Polk and Mr. Owens were both offended by the gesture and felt that Mr. Thompson was out of line.

23.     In February 2014, Mr. Thompson called Mr. Owens into his office for a short update.  Instead of discussing work-related matters, Mr. Thompson began to personally ridicule Mr. Owens, stating that Mr. Owens was passive/aggressive.  Mr. Owens disagreed and Mr. Thompson responded, "Yes you are."  Instead of arguing and participating in a hostile conversation, Mr. Owens just said "OK" and suggested that they focus the meeting on mission-oriented topics. Mr. Owens believes Mr. Thompson started this nonsensical discussion to bait him into an argument which Mr. Thompson could then use to take administrative action against him.

24.     Also in February 2014, Mr. Thompson openly mocked Mr. Owens at an ITIO managers' meeting.  During the presentation, Mr. Thompson wrote the words, "Forrest Grump," and pointed to Mr. Owens.

25.     On March 4, 2014, Mr. Polk scheduled a meeting to discuss implementing VTC at the HHS Southwest Campus.  Mr. Thompson informed Mr. Polk that he intended to attend the meeting, but then arrived late.  Immediately upon his arrival, Mr. Thompson interrupted the meeting and expressed his opinion that the project should be further along.  Mr. Thompson then surprised the group by announcing that Ted Foor, a Caucasian, would be taking over the lead for the project and that Mr. Polk and Mr. Owens would support Mr. Foor.  Mr. Thompson made this statement in front of the contractors and did not advise Mr. Polk or Mr. Owens that they would be removed prior to the meeting.  Mr. Foor later admitted to Mr. Owens and Mr. Polk that he was surprised by Mr. Thompson's decision because, unlike Mr. Polk, he was not an SME on VTC and, unlike Mr. Owens, he was not a certified Project Manager.  Mr. Thompson held Mr. Polk and Mr. Owens to higher standards than Mr. Foor for reporting progress on the project.

26.     On April 21, 2014, Mr. Thompson informed Mr. Owens that he would not receive additional compensation or pay for performing higher GS-15 level duties as the Acting Network Program Manager and Acting Telecommunications Branch Chief, responsibilities Mr. Owens had assumed during the October 2013 to May 2014 time-period.

27.     On Tuesday, April 24, 2014, Mr. Foor was scheduled to give a briefing to the CIO and Deputy CIO, but Mr. Foor was unavailable to give the presentation because he was at home awaiting a package delivery.  Mr. Owens did not have any involvement in Mr. Foor's preparation for the presentation.   However, because of his knowledge of the VTC project, Mr. Owens expressed his concern to Mr. Thompson that the presentation was not appropriate for the audience and failed to address the customer's needs.  Accordingly, at approximately 8:30 am on April 24, Mr. Thompson held an internal meeting with key personnel who would be present at the CIO briefing.  Mr. Owens again expressed his reservations, but everyone else disagreed and thought the presentation should go forward.  Mr. Thompson then asked the group who was going to give the presentation and Jonathan Rhodes volunteered.  Although Mr. Rhoades was willing to do the presentation, Mr. Thompson looked directly at Mr. Owens and said, "Ty is going to give the brief." Mr. Thompson instructed Mr. Owens to give the presentation although he was the only one who expressed that the group was not prepared.

28.     Accordingly, at 10:00 am, Mr. Owens briefed the CIO and Deputy CIO as instructed. At the start of the meeting, it was clear that Mr. Thompson intended to set Mr. Owens up for failure by having him make the presentation.  First, Mr. Thompson instructed Mr. Owens to use a remote to call Mr. Foor.  When Mr. Owens was not able to place the call, Mr. Thompson yelled at Mr. Owens, "You are the Telecom Branch Chief and you can't use the remote?"  Next, as Mr. Owens predicted, the Deputy CIO expressed that the presentation failed to demonstrate how

the customers' needs would be met or how much progress had been made in implementing a UC solution. These where similar to the concerns that Mr. Owens had expressed earlier in the morning.

29.     After the meeting, Mr. Thompson berated and rebuked Mr. Owens in front of Mr. Rhoades, yelling such improper comments as: "That was a fucking train wreck"; "Do you know who you were briefing, that was the CIO and you couldn't answer any of his questions"; "Have you checked out?"; "You think you can do whatever you want?"; "Do you mean that you knew something was wrong [with the presentation] and you did not change the briefing between 9 am and 10 am?"; and "You were not prepared for this briefing…"

30.     Mr. Thompson was clearly enraged. Mr. Owens calmly and respectfully reminded Mr. Thompson that Mr. Foor was scheduled to give the presentation and that he had advised the group that the presentation was not ready for the CIO. As was becoming a recurring practice, Mr. Thompson nonetheless unfairly held Mr. Owens responsible for presenting someone else's work to the CIO and deputy CIO with only one hour to prepare. Mr. Thompson had appointed someone else to be responsible but still contrived a way to use the situation to admonish Mr. Owens.

31.     Following the CIO briefing on April 24, 2014, Mr. Thompson directed Mr. Owens to redo the slide deck that was presented to the CIO and to tailor it for the customer who needed to be briefed the next day. Mr. Thompson was disrespectful toward Mr. Owens in front of vendors (Cisco, eGlobal) and angrily told Mr. Owens that he wanted it done immediately.

32.     On several occasions, Mr. Thompson told Mr. Owens that he was just as qualified as him but that Mr. Owens did not appear to understand what was going on. Mr. Owens concurred that he was just as qualified as Mr. Thompson, but that he had not been empowered. This was Mr. Owens' way of telling Mr. Thompson that the only difference was his race and that he was actually more qualified than him.

33.     After months of being ridiculed by Mr. Thompson, exasperated, Mr. Owens suggested that Mr. Thompson replace him if he was not meeting expectations. Mr. Thompson declined to do so, but he continued to berate Mr. Owens for any small thing he could make into an issue.

34.     On May 21, 2014, Mr. Thompson's administrative assistant scheduled a meeting with Mr. Owens to provide him with a performance evaluation for his time serving as the Acting Branch Chief.  The meeting was scheduled on Mr. Owens' telework day, but he still agreed to come into the office as instructed.  When Mr. Owens arrived, Mr. Thompson rescheduled the time for the meeting several times.  By the afternoon, Mr. Owens was finally informed that the meeting needed to be rescheduled for another day because HR was giving Mr. Thompson conflicting information about evaluating Mr. Owens for serving in an acting position.

35.     Mr. Owens made several other attempts to request that Mr. Thompson complete the paperwork to officially designate him as Acting Branch Chief during the time he served in that position.  However, Mr. Thompson did not complete the paperwork.  As a result, Mr. Owens not only never received an evaluation for his service in an Acting capacity, he also never received compensation for performing these higher, GS-15 level duties.

36.     Mr. Owens applied for a Supervisory IT Specialist, GS-15, position on January 24, 2014. The position had two separate job vacancy numbers, namely HHS-OCIO-MP-14-1033568 and HHS-OCIO-DE-14-1033565, one for government employees and the other an all-source announcement.  Mr. Owens applied under both vacancy announcement numbers.  The Agency classified Mr. Owens as qualified for the position and he was referred to the selecting official. However, Mr. Thompson served as the chair of the interview panel and he made the decision not to interview Mr. Owens for the position.  On May 27, 2014, Mr. Owens learned, via USAJobs,

that he was not selected for the position.  Mr. Thompson falsely and incorrectly claimed that Mr. Owens did not have "help desk and end user desk support" as part of his qualifications when, in fact, these were lower level IT skills that Mr. Owens was able to perform.  Further, neither the vacancy announcement nor the position description lists these duties as a requirement for the position.

37.      Mr. Owens also applied for the Telecommunications Branch Chief, GS-15 position on January 24, 2014, which was the same position he had been serving in an acting capacity since December 2, 2013.  The position had two separate job vacancy numbers, namely HHS-OCIO-DE-14-1030989 and HHS-OCIO-DE-14-1031057 and Mr. Owens applied under both.  Mr. Owens made the best qualified list and was interviewed for the position.

38.      Mr. Owens was the first person to be interviewed for the GS-15 Branch Chief position. During his interview, Mr. Owens was asked to explain a situation where an employee he supervised disobeyed a mandate and what action he took. Mr. Owens responded that he had never been in a situation where an employee directly disobeyed an instruction, but if that occurred, he would take appropriate disciplinary action, such as writing-up the employee, and notifying the appropriate managers or personnel specialists.  After the interview, Mr. Thompson stated that the panel needed to reword the question. Also, the interview panel should have been composed of individuals who were at least equivalent to the grade being filled, but that was not the case for Mr. Owens' panel.  After the interview, Mr. Owens was among the best-qualified applicants and sent to the CIO and his Deputy to make a final selection.

39.      On April 21, 2014, Mr. Owens learned, via USAJobs, that he was not selected for the position.  Later, on May 20, 2014, Mr. Thompson also informed the staff via email that Jon Mitchiner, a Caucasian, had been selected for the Telecommunications Branch Chief position,

although he had already been working for approximately a week when this notification was sent to the staff.  Mr. Mitchiner does not have a telecommunications background.  Mr. Mitchiner also worked with Mr. Thompson at the IRS.  Mr. Owens received outstanding ratings as an IT Specialist and did not have any negative disciplinary actions.  Until Mr. Thompson was assigned as Mr. Owens' supervisor, Mr. Owens was widely regarded as an outstanding employee, respected by both government and contractor personnel.  Despite all of this, Mr. Thompson hired Mr. Mitchiner who had no institutional knowledge of HHS and whose IT knowledge and expertise is far less than Mr. Owens' experience.

40.     In May 2014, after Mr. Owens filed an EEO complaint, Mr. Thompson isolated and excluded him from projects, discussions and other activities.  Mr. Thompson, Mr. Mitchiner and Celine Neves instead went directly to contractor staff about issues and concerns, who in turn sent the requests to Mr. Owens for assistance as they were not in a position to provide the information or complete the task without Mr. Owens' input and knowledge.

41.     In June 2014, Mr. Owens learned that Mr. Thompson gave Gary Wall and Bradley Foster, the only two white males in the Telecom Branch, incentive awards/bonus for 2013.  Mr. Owens had an above satisfactory performance rating, but did not receive a similar incentive award/bonus.

42.     In approximately May 2014, Mr. Mitchiner began his employment as Branch Chief and became Mr. Owens' direct supervisor.  Mr. Mitchiner initiated a campaign of retaliatory harassment against Mr. Owens.  Because Mr. Mitchiner previously worked with Mr. Thompson at the IRS, and the two have a close professional and personal relationship, it became obvious that Mr. Thompson informed Mr. Mitchiner about Mr. Owens' EEO complaint.

43.     From approximately mid-July until mid-August 2014, Mr. Owens was away from the office on FMLA leave.  Immediately upon Mr. Owens return to the office on August 14, 2014, he found a letter from Mr. Mitchiner, on Agency letterhead, informing him to relocate his office by the close of business that day.  It was impossible for Mr. Owens to relocate with one day's notice.  Accordingly, Mr. Owens spent his first day back at work getting permission to move his office the following week.

44.     Mr. Owens was not provided a key to the new office.  When Mr. Owens asked for a key, he was advised that he would not receive one because there were no more keys that could be issued at that time.  The following Monday when Mr. Owens came to work, the doors were locked and he had to wait over an hour before other employees reported to work and let him into the office.  Mr. Owens was also advised that it would take five business days to relocate his phone.

45.     On August 26, 2014, Mr. Owens was in the process of preparing a task order when Mr. Mitchiner added another, new assignment.  The new task was unclear and Mr. Mitchiner imposed an immediate deadline.  Mr. Owens informed Mr. Mitchiner that the new task would prevent him from timely completing another project.  In response, on August 27, 2014, Mr. Mitchiner threatened to write Mr. Owens up for failure to timely communicate concerning the new task.  In the email, Mr. Mitchiner also implemented the following conditions:  Mr. Owens was required to provide a weekly work activity report and to attend thirty (30) minute one-on-one meetings every Monday.  No one else under Mr. Mitchiner's supervision was required to attend a weekly one-on-one meeting.  Mr. Mitchiner unfairly sought to blame and take action against Mr. Owens when Mr. Mitchiner had not clearly communicated his expectations.

46.     On August 26, 2014, Mr. Mitchiner sent Mr. Owens an email after he had left work for the day requesting that Mr. Owens respond to a contractor.  The next day, Mr. Owens explained

that he did not have enough information to respond to the request.  Mr. Mitchiner immediately sent a reply asking Mr. Owens why it took so long to respond to his August 26th email.

47.     On September 3, 2014, Mr. Mitchiner requested that he be copied on any and all communications sent to Mr. Owens as the COR.  No other COR was required to include the supervisor on communications being sent to the Contracting Officer. This request unnecessarily interfered with Mr. Owens' duties as the COR and his ability to conduct business with the Contracting Officer.

48.     On September 9, 2014, Mr. Owens became sick while at work, put in a sick leave request and left the office.  On September 10, 2014, Mr. Owens received an email from Mr. Mitchiner requesting an explanation as to why he left the office and threatening to place Mr. Owens on AWOL.

49.     On September 10, 2014, Mr. Mitchiner attempted to interfere in the performance of Mr. Owens' COR duties by making personnel changes on a contract and approving an invoice. These are tasks are delegated to the authority of Mr. Owens as the COR and, pursuant to federal acquisition regulations, Mr. Owens is responsible for personnel changes and validating invoices. These are not tasks associated with Mr. Mitchiner's position.

50.     On September 16, 2014, Mr. Mitchiner again intervened in the performance of Mr. Owens' COR duties by rejecting a decision made by Mr. Owens regarding personnel changes on the contract.

51.     On September 23, 2014, Mr. Owens sent an email to Mr. Mitchiner requesting to switch his telework days from Thursday to Wednesday.  On September 23, 2014, Mr. Mitchiner responded that Mr. Owens' request was being denied because of supposed concerns about Mr. Owens' performance.  According to Mr. Mitchiner, he was informed by Mr. Thompson that if Mr.

Thompson had to rate Mr. Owens, he would receive a score of "2" on his mid-year review. On September 24, 2014, Mr. Mitchiner issued a Telework Eligibility Change notification to Mr. Owens and informed him that he was ineligible for telework.

52.     The harassment and hostile work environment created by Mr. Thompson and Mr. Mitchiner created a highly unprofessional workplace atmosphere. None of the Caucasian employees supervised by Mr. Thompson and Mr. Mitchiner were disparaged or treated unfairly like Mr. Owens. The constant and baseless criticisms, remarks and rebukes negatively impacted Mr. Owens' employment; unfairly interfered with his ability to perform his job; and made it more difficult for him to carry out his duties, all of which damaged and hampered his career.

53.     As a direct and proximate result of the unlawful acts of HHS and/or agents or employees acting on its behalf, including Mr. Thompson and Mr. Mitchiner among others, Mr. Owens has suffered from emotional distress. Since approximately December 2013, Mr. Owens has been having stress induced asthma attacks. On May 5, 2014, Mr. Owens went to the emergency room and had to be put on steroids to get his asthma attack under control. Mr. Owens missed an entire week of work because of side effects from the medication he was prescribed to control his asthma. Mr. Owens continues to need medical care for his asthma and must take precautions to control a severe recurrence. As a result of his illness, Mr. Owens has used more sick leave than he normally would. Additionally, Mr. Owens was informed by his physician that his blood pressure was higher than it had ever been previously and he was prescribed medication to control his hypertension. Mr. Owens also suffers from depression and anxiety because of the harassment and hostile work environment. This has caused Mr. Owens to be unable to sleep as result of worry and stress about his work situation. Mr. Owens' wife has also noticed that he is depressed and anxious about work and she is worried about Mr. Owens' health and his job.

54.    The unlawful acts of HHS and/or agents or employees acting on its behalf, including Mr. Thompson and Mr. Mitchiner among others, have caused Mr. Owens embarrassment, humiliation and indignity, as well as damage to his professional reputation and career.  Despite serving as Branch Chief in an acting capacity, he was discriminatorily not selected for the position.  Mr. Owens was also not selected for the Supervisory IT Specialist position.   As a direct and proximate result of these non-selections, Mr. Owens has suffered harm including, but not limited to, loss of substantial past and future salary, awards, benefits and entitlements, loss of professional status, career-enhancing and advancement opportunities and loss of retirement and other employment benefits and privileges.

## EXHAUSTION OF REMEDIES

55.    Mr. Owens has exhausted all administrative requirements that apply to the processing of his complaint, including the filing of an informal and a formal complaint with the EEO office and the issuance of a Final Agency Decision.

## STATEMENT OF CLAIMS

**COUNT I:  Violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e *et seq.*
Hostile Work Environment and Harassment Based on Race .**

56.    Mr. Owens adopts and incorporates by reference all averments in the foregoing paragraphs.

57.    Title VII prohibits federal agencies from creating a hostile work environment or engaging in harassment against its employees because of race.  Mr. Owens is an African-American male.

58.    Defendant, HHS, was, at all times relevant to this matter, the employer of Mr. Owens for all purposes under Title VII.

59.     HHS and/or agents or employees acting on its behalf, including Mr. Thompson and Mr. Mitchiner among others, harassed Mr. Owens and created a hostile work environment by making constant and baseless criticisms, remarks and rebukes that negatively impacted Mr. Owens' employment; unfairly interfered with his ability to perform his job; and made it more difficult for him to carry out his duties, all of which damaged and hampered his career.  The harassment made Mr. Owens's work environment intolerable and hostile.

60.     HHS and/or agents or employees acting on its behalf, including Mr. Thompson and Mr. Mitchiner among others, treated Mr. Owens differently and less favorably than other white and female peers and co-workers.

61.     As a direct and proximate result of the unlawful acts of HHS and/or agents or employees acting on its behalf, including Mr. Thompson and Mr. Mitchiner among others, Mr. Owens has suffered from emotional distress from being harassed and subjected to a hostile work environment because of his race.

62.     The unlawful acts of HHS and/or agents or employees acting on its behalf, including Mr. Thompson and Mr. Mitchiner among others, have further caused Mr. Owens embarrassment, humiliation and indignity, as well as damage to his professional reputation and career.  This harm includes, but is not limited to, a loss of professional status, career-enhancing and advancement opportunities as a result of being harassed and subjected to a hostile work environment because of his race.

63.     As a direct and proximate result of the unlawful acts of HHS and/or agents or employees acting on its behalf, including Mr. Thompson and Mr. Mitchiner among others, Defendant is additionally liable to Mr. Owens for those damages, as well as for attorneys' fees, the costs of this litigation, and accrued interest.

**COUNT II:  Violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e *et seq.***
**Hostile Work Environment and Harassment Based on Gender.**

64.     Mr. Owens adopts and incorporates by reference all averments in the foregoing paragraphs.

65.     Title VII prohibits federal agencies from creating a hostile work environment or engaging in harassment against its employees because of gender and sex.  Mr. Owens is an African-American male.

66.     Defendant, HHS, was, at all times relevant to this matter, the employer of Mr. Owens for all purposes under Title VII.

67.     HHS and/or agents or employees acting on its behalf, including Mr. Thompson and Mr. Mitchiner among others, harassed Mr. Owens and created a hostile work environment by making constant and baseless criticisms, remarks and rebukes that negatively impacted Mr. Owens' employment; unfairly interfered with his ability to perform his job; and made it more difficult for him to carry out his duties, all of which damaged and hampered his career.  The harassment made Mr. Owens's work environment intolerable and hostile.

68.     HHS and/or agents or employees acting on its behalf, including Mr. Thompson and Mr. Mitchiner among others, treated Mr. Owens differently and less favorably than other white and female peers and co-workers.

69.     As a direct and proximate result of the unlawful acts of HHS and/or agents or employees acting on its behalf, including Mr. Thompson and Mr. Mitchiner among others, Mr. Owens has suffered from emotional distress from being harassed and subjected to a hostile work environment because of his gender.

70.     The unlawful acts of HHS and/or agents or employees acting on its behalf, including Mr. Thompson and Mr. Mitchiner among others, have caused Mr. Owens

embarrassment, humiliation and indignity, as well as damage to his professional reputation and career. This harm includes, but is not limited to, a loss of professional status, career-enhancing and advancement opportunities as a result of being harassed and subjected to a hostile work environment because of his gender.

71.     As a direct and proximate result of the unlawful acts of HHS and/or agents or employees acting on its behalf, including Mr. Thompson and Mr. Mitchiner among others, Defendant is additionally liable to Mr. Owens for those damages, as well as for attorneys' fees, the costs of this litigation, and accrued interest.

**COUNT III:   Violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e *et seq.*
Hostile Work Environment and Harassment Based on Reprisal/Retaliation.**

72.     Mr. Owens adopts and incorporates by reference all averments in the foregoing paragraphs.

73.     Title VII prohibits federal agencies from creating a hostile work environment or engaging in harassment against its employees because of engaging in protected activities (reprisal/retaliation). Mr. Owens engaged in protected activities by filing an EEO complaint on May 23, 2014.

74.     Defendant, HHS, was, at all times relevant to this matter, the employer of Mr. Owens for all purposes under Title VII.

75.     HHS and/or agents or employees acting on its behalf, including Mr. Thompson and Mr. Mitchiner among others, harassed Mr. Owens and created a hostile work environment by making constant and baseless criticisms, remarks and rebukes that negatively impacted Mr. Owens' employment; unfairly interfered with his ability to perform his job; and made it more difficult for him to carry out his duties, all of which damaged and hampered his career. The harassment made Mr. Owens's work environment intolerable and hostile.

76.     HHS and/or agents or employees acting on its behalf, including Mr. Thompson and Mr. Mitchiner among others, treated Mr. Owens differently and less favorably because of his protected activities.

77.     As a direct and proximate result of the unlawful acts of HHS and/or agents or employees acting on its behalf, including Mr. Thompson and Mr. Mitchiner among others, Mr. Owens has suffered from emotional distress from being harassed and subjected to a hostile work environment because of reprisal.

78.     The unlawful acts of HHS and/or agents or employees acting on its behalf, including Mr. Thompson and Mr. Mitchiner among others, have caused Mr. Owens embarrassment, humiliation and indignity, as well as damage to his professional reputation and career.  This harm includes, but is not limited to, a loss of professional status, career-enhancing and advancement opportunities as a result of being harassed and subjected to a hostile work environment because of reprisal.

79.     As a direct and proximate result of the unlawful acts of HHS and/or agents or employees acting on its behalf, including Mr. Thompson and Mr. Mitchiner among others, Defendant is additionally liable to Mr. Owens for those damages, as well as for attorneys' fees, the costs of this litigation, and accrued interest.

**COUNT IV:  <u>Violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e *et seq.*</u>**
**<u>Pay Disparity Against Mr. Owens on the Basis of Race.</u>**

80.     Mr. Owens adopts and incorporates by reference all averments in the foregoing paragraphs.

81.     Title VII prohibits employers from discriminating against its employees on the basis of race.  Mr. Owens is an African-American male.

82.     Defendant, HHS, was, at all times relevant to this matter, the employer of Mr. Owens for all purposes under Title VII.

83.     Mr. Owens performed all of the essential functions and duties of the Branch Chief position from his appointment on December 2, 2013, until May 5, 2014, when a new Branch Chief was selected.  Similarly, Mr. Owens also carried out all of the job duties of the Acting Network Program Manager and COR.  Concurrent with these higher level duties, Mr. Owens was still responsible for his job functions as an IT Specialist, GS-14 because ITIO was under staffed.  Yet, despite performing the duties of three (3) separate positions, two of which were higher graded, Mr. Owens was not compensated for the higher level duties or additional workload.

84.     Mr. Owens repeatedly made inquiries as to when the pay disparity would be corrected but Mr. Thompson and/or other Agency officials repeatedly ignored Mr. Owens' complaint about the pay disparity.  On April 21, 2014, Mr. Thompson informed Mr. Owens that he would not receive additional compensation or pay for performing higher GS-15 level duties.

85.     Additionally, in June 2014, Mr. Owens learned that Mr. Thompson gave Gary Wall and Bradley Foster, the only two white males in the Telecom Branch, incentive awards/bonus for 2013.  Mr. Owens had an above satisfactory performance rating, but did not receive a similar incentive award/bonus.

86.     The Agency discriminated against Mr. Owens on the bases of his race (African-American) by failing to correct this pay disparity and by failing to give him an incentive award/bonus.

87.     As a direct and proximate result of the unlawful acts of HHS and/or agents or employees acting on its behalf, including Mr. Thompson among others, Mr. Owens has suffered

from emotional distress from the Agency's failure to correct this pay disparity and its failure to give him an incentive award/bonus.

88.     The unlawful acts of HHS and/or agents or employees acting on its behalf, including Mr. Thompson among others, have caused Mr. Owens embarrassment, humiliation and indignity, as well as damage to his professional reputation and career.  This harm includes, but is not limited to, a loss of professional status, career-enhancing and advancement opportunities as a result of the Agency's failure to correct this pay disparity and its failure to give him an incentive award/bonus.

89.     As a direct and proximate result of the unlawful acts of HHS and/or agents or employees acting on its behalf, including Mr. Thompson among others, Defendant is additionally liable to Mr. Owens for those damages, as well as for attorneys' fees, the costs of this litigation, and accrued interest.

**COUNT V:   Violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e _et seq._**
**Non-Selection for the Supervisory IT Specialist, GS-15, position on the Basis of Race.**

90.     Mr. Owens adopts and incorporates by reference all averments in the foregoing paragraphs.

91.     Title VII prohibits employers from discriminating against its employees on the basis of race.  Mr. Owens is an African-American male.

92.     Defendant, HHS, was, at all times relevant to this matter, the employer of Mr. Owens for all purposes under Title VII.

93.     On January 24, 2014, 2014, Mr. Owens applied for a Supervisory IT Specialist, GS-15, position.  The Agency classified Mr. Owens as qualified for the position and he was referred to the selecting official.  Mr. Thompson served as the chair of the interview panel and, on May 27, 2014, Mr. Owens learned, via USAJobs, that he was not selected for the position.

94.     The Agency discriminated against Mr. Owens on the bases of his race (African-American) by failing to select him for the Supervisory IT Specialist, GS-15, position.

95.     As a direct and proximate result of the unlawful acts of HHS and/or agents or employees acting on its behalf, including Mr. Thompson among others, Mr. Owens has suffered from emotional distress from the Agency's failure to select him for the Supervisory IT Specialist, GS-15, position.   The unlawful acts of HHS and/or agents or employees acting on its behalf, including Mr. Thompson among others, have caused Mr. Owens embarrassment, humiliation and indignity, as well as damage to his professional reputation and career.   This harm includes, but is not limited to, loss of substantial past and future salary, awards, benefits and entitlements, loss of professional status, career-enhancing and advancement opportunities and loss of retirement and other employment benefits and privileges.

96.     As a direct and proximate result of the unlawful acts of HHS and/or agents or employees acting on its behalf, including Mr. Thompson among others, Defendant is additionally liable to Mr. Owens for those damages, as well as for attorneys' fees, the costs of this litigation, and accrued interest.

**COUNT VI:  Violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e *et seq.*
Non-Selection for the Telecommunications Branch Chief, GS-15, position on the
Basis of Race**

97.     Mr. Owens adopts and incorporates by reference all averments in the foregoing paragraphs.

98.     Title VII prohibits employers from discriminating against its employees on the basis of race.  Mr. Owens is an African-American male.

99.     Defendant, HHS, was, at all times relevant to this matter, the employer of Mr. Owens for all purposes under Title VII.

100.    On January 24, 2014, Mr. Owens applied for the Telecommunications Branch Chief, GS-15, the position he had been serving in an acting capacity since December 2, 2013.  Mr. Owens made the best qualified list and was interviewed for the position.  After the interview, Mr. Owens was among the best-qualified applicants and sent to the CIO and his Deputy to make a final selection.

101.    On April 21, 2014, Mr. Owens learned, via USAJobs, that he was not selected for the position.  Later, on May 20, 2014, Mr. Thompson also informed the staff via email that Jon Mitchiner had been selected for the Telecommunications Branch Chief position.  Unlike Mr. Owens, Mr. Mitchiner does not have a telecommunications background and has no institutional knowledge of HHS.  Mr. Mitchiner also worked with Mr. Thompson at the IRS.

102.    The Agency discriminated against Mr. Owens on the bases of his race (African-American) by failing to select him for the Telecommunications Branch Chief, GS-15, the position.

103.    As a direct and proximate result of the unlawful acts of HHS and/or agents or employees acting on its behalf, including Mr. Thompson among others, Mr. Owens has suffered from emotional distress from the Agency's failure to select him for the Telecommunications Branch Chief, GS-15, the position.

104.    The unlawful acts of HHS and/or agents or employees acting on its behalf, including Mr. Thompson among others, have caused Mr. Owens embarrassment, humiliation and indignity, as well as damage to his professional reputation and career.  This harm includes, but is not limited to, loss of substantial past and future salary, awards, benefits and entitlements, loss of professional status, career-enhancing and advancement opportunities and loss of retirement and other employment benefits and privileges.

105.    As a direct and proximate result of the unlawful acts of HHS and/or agents or employees acting on its behalf, including Mr. Thompson among others, Defendant is additionally liable to Mr. Owens for those damages, as well as for attorneys' fees, the costs of this litigation, and accrued interest.

## **RELIEF SOUGHT**

**WHEREFORE**, Mr. Owens requests that this Court award damages against Defendant and respectfully requests the Court to:

A.    Enter judgment for Plaintiff against Defendant on all Counts;

B.    Declare that Defendant subjected Plaintiff to harassment and a hostile work environment because of his race;

C.    Declare that Defendant subjected Plaintiff to harassment and a hostile work environment because of his gender/sex;

D.    Declare that Defendant subjected Plaintiff to harassment and a hostile work environment because of reprisal;

E.    Declare that Defendant discriminated against Plaintiff because of his race by failing to compensate him for performing higher graded duties and failing to give him an incentive award/bonus;

F.    Declare that Defendant discriminated against Plaintiff because of his race by failing to select him for the Supervisory IT Specialist, GS-15, position;

G.    Declare that Defendant discriminated against Plaintiff because of his race by failing to select him for the Telecommunications Branch Chief, GS-15, the position;

H.    Award Mr. Owens full back pay and front pay, including salary, benefits, entitlements, loss of professional status and career-enhancing opportunities, cash awards, loss of

retirement savings and benefits, and other remuneration and privileges of employment retroactive to the date of any unlawful action found to have occurred in this case;

I.      Award Mr. Owens compensatory damages for the emotional distress injuries and losses that he suffered in an amount to be proved at trial;

J.      Award Mr. Owens pecuniary and out of pocket expenses;

K.      Enjoin Defendant from future retaliation and discrimination against Mr. Owens;

L.      Order Defendant to pay all reasonable attorneys' fees, court costs, and expenses Mr. Owens has and will incur as a result of Defendant's actions and inactions, as well as pre-judgment and post-judgment interest; and,

M.      Order such other equitable and legal relief as the Court deems necessary and appropriate to make Mr. Owens whole.

## **JURY DEMAND**

Plaintiff requests a trial by a jury as to all claims set forth in this Complaint.


Respectfully submitted,


  _/s/ Camilla C. McKinney_____
Camilla C. McKinney, Esq.
D.C. Bar No. 448776
McKinney & Associates, PLLC
1250 Connecticut Avenue, NW, Suite 200
Washington, DC  20036
(202) 470-0935 (telephone)
(877) 590-4777 (facsimile)
CMcKinney@DCEmploymentLawyer.com
***Attorneys for Plaintiff Ty Orr Owens***